# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Seizure of | ) |
| All funds, credits, and monetary instruments up to $3,245, in or associated with E*TRADE Roth IRA Account # ███ 7829, in the name of Erin E. Gallagher. | ) ) ) ) ) ) ) Case No. 4:17MJ5256 NAB |

## APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT

I, Kevin Cosentino, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe that there is now certain property namely

All funds, credits, and monetary instruments up to $3,245, in or associated with E*TRADE Roth IRA Account # ███ 7829, in the name of Erin E. Gallagher,

**which is**

subject to forfeiture under Title 18, United States Code, Sections 981(a) and 982(a) and Title 28, United States Code, Section 2461, and therefore, is subject to seizure under Title 18, United States Code, Sections 981(b) & 982(b) and Title 21, United States Code, Sections 853(e)&(f) concerning a violation of Title 18, United States Code, Section 1343.

The funds identified herein are subject to civil forfeiture without regard to their traceability to criminal activity because they are contained in an account into which identical traceable property has been deposited and therefore may be forfeited as fungible property under Title 18, United States Code, Section 984.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

Continued on the attached sheet and made a part hereof.     _X_ Yes ____ No

**Signature of Affiant**, Special Agent Kevin Cosentino

Sworn to before me, and subscribed in my presence

October 18, 2017 _at 16:09_
**Date and Time Issued**

at  St. Louis, Missouri
**City and State**

Honorable Nannette A. Baker, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

**Signature of Judicial Officer**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

### INTRODUCTION

1.      I, Kevin Cosentino, am a Special Agent with the Federal Bureau of Investigation and have been so employed for the past 26 years.  I am assigned to the St. Louis, Missouri, field office where I have specialized in white collar crime and fraud investigations of various kinds for 20 of the past 26 years.  I am responsible for, among other assignments, conducting investigations of alleged criminal violations of Title 18, United States Code, Sections 1343, wire fraud, and Section 1957, the money laundering spending statute.

2.      I have personally participated in investigations involving the violations of federal law regarding mail fraud, wire fraud and other federal violations such as money laundering that result from such unlawful activity.  I have personally participated in the execution of search warrants and seizure warrants, involving the search for various types of evidence and property.  As a federal agent, I am authorized to investigate violations of the laws of the United States and to seek forfeiture of property under the authority of the United States.

3.      Since approximately July 7, 2017, I have been investigating a wire fraud scheme involving John J. Koeln ("Koeln"), the former Director of Finance at Unlimited Prepay Distribution ("UPD").  Based on the results of my investigation, there is probable cause to believe that Koeln fraudulently obtained approximately $1,007,031.80 from UPD through a wire fraud scheme in violation of Title 18, United States Code, Section 1343.  In addition, there is probable cause to believe that Koeln used some of these criminal proceeds to purchase residential property and conveyances in violation of Title 18, United States Code, Section 1957.  As such, the property described in Attachment A is subject to civil and criminal forfeiture.

1

4.      This affidavit does not contain all of the information known to me in regard to the investigation; however, it contains enough information to establish probable cause to authorize the seizure of the property described in Attachment A.  Although individuals are referred to herein by their initials in an effort to protect their privacy in the event that this affidavit becomes part of the public record, their identities are known to me.  I respectfully submit that the information provided by these individuals is reliable and is corroborated by the independently obtained statements of other individuals as well as, in some cases, by financial records.

## STATUTORY FRAMEWORK

5.      18 U.S.C. § 1343 (wire fraud) criminalizes devising or intending to devise a scheme to defraud (or performing specific fraudulent acts) through the use of an interstate telephone call or electronic communication.

6.      18 U.S.C. § 1957 (the money laundering spending statute) criminalizes knowingly engaging or attempting to engage in a monetary transaction in criminally derived property from a specified unlawful activity in an amount greater than $10,000.  The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), and it includes violations of wire fraud (18 U.S.C. § 1343).

7.      The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities.  Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture.  In addition, 28 U.S.C. § 2461(c) provides that, "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain forfeiture of property "as part of the sentence in the criminal case."  Thus, pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C), any property, real or personal,

2

which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

8.      Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities.  Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property, is subject to civil forfeiture.  In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1957, or any property traceable to such property, is subject to criminal forfeiture.  Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime.  These forfeitures encompass all property "involved in" the crime, which can include untainted funds that are comingled with tainted funds derived from illicit sources.

9.      This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could be placed beyond process if not seized by warrant.

10.     Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized by a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture.  A civil forfeiture action may be brought in any district where "acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A).  As detailed below, acts or omissions in furtherance of the fraud and money laundering scheme under investigation occurred in the Eastern District of Missouri.  The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action.  21 U.S.C. § 853(f) provides authority for the issuance of a seizure warrant for property subject to criminal forfeiture.

11.    Finally, 18 U.S.C. § 984 allows the United States to seize for civil forfeiture identical substitute property found in the same place where the "guilty" property had been kept. For purposes of Section 984, this affidavit need not demonstrate that the funds now in the target accounts are the particular funds involved in the fraud and money laundering violations, so long as the forfeiture is sought for other funds on deposit in that same account. Section 984 applies to civil forfeiture actions commenced within one year from the date of the offense.

12.    Based on the foregoing, the issuance of this seizure warrant is authorized under 21 U.S.C. § 853(f) and 18 U.S.C. § 982(b)(1) for criminal forfeiture; and 18 U.S.C. § 981(b) and 984, and 31 U.S.C. § 5317(c)(2) for civil forfeiture. Notwithstanding the provisions of Rule 41(a) of the Federal Rules of Criminal Procedure, the issuance of this seizure warrant in this district is appropriate under 18 U.S.C. § 981(b)(3) and 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in the Eastern District of Missouri.

## FACTS ESTABLISHING PROBABLE CAUSE TO BELIEVE A CRIME HAS BEEN COMMITTED

13.    As fully explained, detailed, and supported below, there is probable cause to believe that Koeln has operated an illegal wire fraud scheme in the Eastern District of Missouri, and that laundered the proceeds to purchase houses and cars. The investigation has revealed that between May 26, 2015, and February 10, 2017, Koeln received at least $864,260.39 in direct transfers from UPD to a First Bank account that he controlled and which your affiant believes constitute the proceeds of his illegal wire fraud scheme. In addition, between November 19, 2015, and March 3, 2017, Koeln received at least $42,796.41 in direct transfers from UPD to a Regions bank account (the "Regions Account") that he controlled and which your affiant believes constitute the proceeds

of his illegal wire fraud scheme.[1]  Finally, on March 14, 2017, Koeln received an additional $99,975 direct transfer from UPD to an E*Trade account that he controlled and which your affiant believes constitute the proceeds of his illegal wire fraud scheme.

14.    On July 11, 2017, your affiant interviewed A.A., the UPD Chief Operating Officer. A.A. stated that in 2015, he had explored the possibility of purchasing a property to move the UPD operations, as the company's lease was due to expire in May of 2016.  A.A. discussed this potential move with Koeln, who was at the time the UPD Director of Finance.  A.A. further stated that Koeln had formed Abusharbain Holding, LLC, ("Abusharbian") for the purpose of purchasing the new property.  Koeln told A.A. that the company had approximately $1,000,000 available for the purchase of a new site.  A.A. stated that he looked at a few properties, but the cost to purchase and rehab would have exceeded $1,000,000, so he decided to stay at the current leased location.  A.A. stated that once he decided not to purchase a new property, he did not have any further conversations with Koeln regarding Abusharbain.

15.    A.A. stated that Koeln did not have permission to open any bank accounts for Abusharbain.  A.A. was unaware that Koeln had opened an account at First Bank for Abusharbain. A.A. further stated that Koeln did not have permission to move UPD funds to the Abusharbain Holding, LLC bank account.

16.    A.A. stated Koeln was the only UPD employee who was authorized to make ACH and/or wire transfers from UPD accounts at Bank of America.  Koeln was also given a UPD credit card for purposes of making business expenditures only.  A.A. stated that Koeln did not have permission to use the UPD credit card for personal expenditures.

---

[1] This warrant does not seek the seizure and forfeiture of the Regions Account.

17.     A.A. stated he couldn't figure out why UPD needed to tap a reserve line of credit to meet expenses at the end of 2016, when in 2015 UPD allegedly had $1 million available to purchase a property. A.A. stated that he focuses on sales and growing the business and is not a "finance guy." A.A. was always traveling out of state and trusted Koeln completely with the finances of UPD.

18.     In approximately March 2017, the UPD Controller discovered that Koeln appeared to be using the UPD credit card to pay for personal expenditures. For example, the UPD Controller noticed that Koeln appeared to be charging his personal utilities to the UPD credit card. In addition, it appeared that Koeln was using the UPD credit card to pay for expensive family vacations. A.A. stated that the credit card was taken from Koeln sometime in the end of March or early April 2017. A.A. believes that Koeln may have charged as much as $200,000 in personal expenditures to the UPD credit card, but has not yet completed his analysis.

19.     In March 2017, A.A. told Koeln that all future ACH and/or wire transfers would require both an attached invoice and secondary approval. According to A.A., Koeln did not like this requirement, and he resigned from UPD within two weeks.

20.     Your affiant worked with other investigators to identify and trace the funds obtained by Koeln as proceeds of his illegal wire fraud scheme. The investigative team has conducted a review of all financial records associated with the investigation, including bank statements, bank deposit records, checks, cashier's checks, credit card statements, loan applications and documents, property sales records, and any other financial records obtained during the course of the investigation, in order to trace funds related to the illegal activity and determine the origin of funds used by Koeln to purchase assets, such as real property, vehicles, a boat and financial investments.

21.     The financial investigation has determined that Koeln fraudulently obtained at least $1,007,031.80 in proceeds from the wire fraud scheme, and laundered some of those criminal proceeds to purchase residential homes and conveyances.

**FACTS ESTABLISHING PROBABLE CAUSE TO BELIEVE
THAT THE PROPERTY TO BE SEIZED IS SUBJECT TO FORFEITURE**

22.     Bank and investment account records confirm that Koeln controlled at least six bank and investment accounts during the period of the fraudulent scheme, including:

 a.  First Bank account #███████6104 held in the name of Abusharbain Holdings, LLC ("Account #1");

 b.  E*Trade account #███████8839 held in the name of John J. Koeln and Erin G. Koeln ("Account #2");

 c.  E*Trade account #█████-8345 held in the name of John J. Koeln and Erin Gallacher Joint Investment Account ("Account #3");

 d.  E*Trade account #█████-7822 held in the name of John J. Koeln, Roth IRA ("Account #4");

 e.  E*Trade account #█████-7829 held in the name of Erin E. Gallagher, Roth IRA ("Account #5"); and

 f.  American Eagle Credit Union account #███2319 held in the name of John J. Koeln (subs 00,90 and 96) ("Account #6").

ACCOUNT #1

23.     On May 12, 2015, Koeln opened Account #1 in the name of Abusharbain with a cash deposit in the amount of $495.  On the account opening documents, Koeln listed himself as the CFO of Abusharbain.  As discussed above, A.A. did not give Koeln permission to open Account #1.

24.     Between May 26, 2015, and February 10, 2017, Koeln deposited at least $864,260.39 in criminal proceeds from his wire fraud scheme into Account #1.  The only other deposit into Account #1 was a $500 cash deposit on January 21, 2016.

7

25.    On February 2, 2016, Cashier's Check #2500279711 in the amount of $116,827.74 was drawn on this account and made payable to U.S. Title, for the purchase of real property located at 9830 W. Vista Drive, Hillsboro, MO 63050 (the "Vista Drive Property"). The Vista Drive Property is titled to Koeln and his spouse.

26.    On May 19, 2016, an ACH payment of $19,052.15 was made from Account #1 related to an auto loan on a 2015 Buick Enclave Premium, VIN: 5GAKRCKD5FJ123488, (the "Enclave"), which was purchased on or about October 22, 2014, and is titled to Koeln.

27.    On January 20, 2017, a payment in the amount of $39,658.94 was made from Account #1 to pay off the outstanding loan balance on a 2016 203 VRX Chaparral, Hull ID #FGBU0146K516 and a Coyote Manufacturing Corp, Boat Trailer, VIN: 5001B2312GN368080 (the"Boat and Trailer"). The Boat and Trailer were originally purchased by Koeln on March 5, 2016. Up until he paid off the loan, Koeln made monthly payments using funds from the Regions Account.

28.    On February 17, 2017, Account #1 was closed.

29.    Based on the foregoing, there is probable cause to believe that the sole source of funding for Account #1 was wire fraud proceeds, and that those criminal proceeds were then transferred to other accounts controlled by Koeln, as further described below. In addition, there is probable cause to believe that some of the criminal proceeds in Account #1 were subsequently used to purchase the Vista Drive Property, the Enclave and the Boat and Trailer in violation of the money laundering spending statute. As such, the Enclave and the Boat and Trailer are subject to seizure and forfeiture as traceable to proceeds of wire fraud, and as being involved in a money laundering violation.

ACCOUNT #2

30.     Account #2 is an E*Trade account held in the name of Koeln and his spouse. Account #2 was opened prior to the aforementioned criminal activity.  On April 26, 2016, the balance in Account #2 was $13.30.

31.     Between April 27, 2016, and February 17, 2017, Koeln transferred at least $665,456.56 from Account #1 to Account #2.  In addition, over the same time period, Account #2 received $136,774.65 from Account #3 and $19.35 in dividends/interest

32.     On March 14, 2017, Account #2 received a $99,975 direct transfer from UPD.

33.     The funds from Accounts #1, #2, and #3, and the dividends/interest earned, were the only sources of funding for Account #2 during this time period.

34.     On July 31, 2017, the balance in Account #2 was $23,753.74.

35.     Based on the foregoing, there is probable cause to believe that, after April 26, 2016, the sole source of funding for Account #2 was wire fraud proceeds.  As such, the funds in Account #2 up to $665,456.56 are subject to seizure and forfeiture as traceable to proceeds of wire fraud.

ACCOUNT #3

36.     Account #3 is an E*Trade account held in the name of Koeln and his spouse. Account #3 was opened prior to the aforementioned criminal activity.  On April 1, 2016, the balance in Account #3 was $0.13.

37.     Between May 20, 2016, and June 6, 2017, Koeln transferred at least $293,225.35 from Account #2 to Account #3 (which is calculated as $430,000.00 transferred in from Account #2 less $136,774.65 transferred back to Account #2).  These proceeds were the primary source of

9

funding for this account during this time period. The only other sources of funding during this time period was $2,000 from the Regions Account and $118.81 in dividends and interest.

38.     On June 30, 2017, the remaining balance in Account #3 was $200,525.34.

39.     Based on the foregoing, there is probable cause to believe that, since May 20, 2016, the sole source of funding for Account #3 was wire fraud proceeds. As such, funds in Account #3 up to $293,225.35 are subject to seizure and forfeiture as traceable to proceeds of wire fraud.

ACCOUNT #4

40.     Account #4 is an E*Trade account held in the name of Koeln. Account #4 was opened prior to the aforementioned criminal activity. On March 31, 2016, the balance in Account #4 was $6,331.30.

41.     On May 19, 2016, Koeln transferred at least $3,245 in proceeds from Account #2 to Account #4. These proceeds were primary source of funding for this account during this time period. The only other sources of funding during this time period was a $1,000.00 transfer from the Regions Account and $531.95 in dividends and interest. The remaining increase in the account balance was due to market price fluctuations.

42.     On July 31, 2017, the remaining balance in Account #4 was $12,917.65.

43.     Based on the foregoing, there is probable cause to believe that $3,245 in criminal proceeds were deposited into Account #4. As such, up to $3,245 of the funds in Account #4 are subject to seizure and forfeiture as traceable to proceeds of wire fraud.

ACCOUNT #5

44.     Account #5 is an E*Trade account held in the name of Koeln's wife. Account #5 was opened prior to the aforementioned criminal activity. On March 31, 2016, the balance in Account #4 was $6,331.30.

45.     On May 19, 2016, Koeln transferred at least $3,245 in proceeds from Account #2 to Account #5. These proceeds were the only source of funding for this account during this time period. The only other sources of funding during this time period were $1,000.00 in contributions from the Regions Account and $531.95 in dividends and interest. The remaining increase in the account balance was due to market price fluctuations.

46.     On July 31, 2017, the remaining balance in Account #5 was $12,917.65.

47.     Based on the foregoing, there is probable cause to believe that $3,245 in criminal proceeds were deposited into Account #5. As such, up to $3,245 of the funds in Account #5 are subject to forfeiture as traceable to proceeds of wire fraud.

ACCOUNT # 6

48.     Account #6 is an American Eagle Credit Union account held in the name of Koeln. Account #6 was opened prior to the aforementioned criminal activity. On May 18, 2016, the balance in Account #6 was $9,191.65.

49.     Between May 18, 2016, and August 31, 2017, Koeln transferred at least $384,595 in proceeds from Account #2 to Account #6, and $100,000 from Account #3 to Account #6. These proceeds were the only source of funding for Account #6 during this time period, with the exception of $7,001.50 in other deposits and dividends.

50.     On April 25, 2017, a payment in the amount of $45,000 was made from Account #6, payable to Elco Chevrolet Cadillac to purchase a 2014 Cadillac Escalade Platinum, VIN: 1GYS4DEFXER119849 (the "Escalade"), which is currently titled to Koeln.

51.     On June 30, 2017, a payment in the amount of $104,876.89 was made from Account #6 to U.S. Title, for the purchase of real property located at 2316 Rosegarden Drive, St. Louis, MO 63125 (the "Rosegarden Drive Property"). The Rosegarden Drive Property is titled to Koeln.

11

52.     On August 31, 2017, the remaining balance in Account #6 was $236,131.68.

53.     Based on the foregoing, there is probable cause to believe that, since May 18, 2016, the primary source of funding for Account #6 was wire fraud proceeds. As such, the funds in Account #6 up to $484,595 are subject to forfeiture as traceable to proceeds of wire fraud. In addition, there is probable cause to believe that some of the criminal proceeds that were deposited into Account #6 were subsequently used to purchase the Escalade and the Rosegarden Drive Property in violation of the money laundering spending statute. As such, the Escalade is subject to forfeiture as traceable to proceeds of wire fraud, and as being involved in a money laundering violation.

## CONCLUSION

54.     Based on the information above, I believe that approximately $1,007,031.80 in wire fraud proceeds was deposited into various accounts controlled by Koeln, and that a portion of these criminal proceeds were used to purchase various real properties and conveyances. As such, I respectfully submit there is probable cause to seize the assets in Attachment A, on the grounds they are derived from the proceeds of wire fraud and are involved in money laundering offenses, and are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) & (a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c).

## ATTACHMENT A

A. All funds, credits, and monetary instruments up to $665,456.56 in or associated with E*TRADE Complete Savings Account # ███ 8839, in the name of John J. Koeln & Erin G. Koeln;

B. All funds, credits, and monetary instruments up to $293,225.35 in or associated with E*TRADE Joint Investment Account # ███ 8345, in the name of John J. Koeln & Erin E. Gallagher, JTWROS;

C. All funds, credits, and monetary instruments up to $3,245, in or associated with E*TRADE Roth IRA Account # ███ 7822, in the name of John J. Koeln;

D. All funds, credits, and monetary instruments up to $3,245, in or associated with E*TRADE Roth IRA Account # ███ 7829, in the name of Erin E. Gallagher;

E. All funds, credits, and monetary instruments up to $484,595, in or associated with American Eagle Credit Union Accounts # ███ 19-00, -90, and -96, in the name of John J. Koeln.

F. 2015 Buick Enclave Premium, VIN: 5GAKRCKD5FJ123488

G. 2014 Cadillac Escalade Platinum, VIN: 1GYS4DEFXER119849

H. 2016 203 VRX Chaparral, Hull ID #FGBU0146K516

I. Coyote Manufacturing Corp, Boat Trailer, VIN: 5001B2312GN368080